TO BE PUBLISHED IN F. SUPP. 2d

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
CASE NO. 2:08cv00235(WOB)

SCOTT A SAVAGE                                          PLAINTIFF

VS.                      <u>OPINION AND ORDER</u>

E. GORDON GEE, ET AL                                   DEFENDANTS

BERTELSMAN, District Judge:*

This matter is before the court on defendants' motion for summary judgment (Doc. #46)[1], which the court previously took under submission.

Having reviewed the matter further, including the parties' supplemental briefs (Doc. #62, #63, #65, #66), the court now issues the following Opinion and Order.

*Factual and Procedural Background*

A.  <u>Proposals Regarding Freshmen Reading Requirement</u>

Plaintiff, Scott A. Savage ("Savage"), was Head of Reference and Library Instruction at Ohio State University's campus in Mansfield, Ohio from August 2004 until June 27, 2007, when he resigned.  Savage describes himself as an "original" or "conservative" Quaker.

_____

_____

[1]Defendants are present and former Presidents of Ohio State University, an Assistant Vice-President, a Human Resources official, various trustees, and four faculty members.

    * Honorable William O. Bertelsman, United States District
Court, Eastern District of Kentucky, sitting by designation.

    Savage was an elected staff representative to the faculty-staff Executive Committee, which met regularly to exchange ideas with OSU-Mansfield Dean Evelyn Freeman.  In December 2005, Donna Hight ("Hight"), Student Affairs Director, proposed to the Executive Committee that all incoming freshmen be assigned a particular book to read.  This proposal was accepted and, in 2006, Savage agreed to serve on the committee formed to choose the book.  Other members of the committee included defendants, Hannibal Hamlin and Norman Jones, both faculty members.[2]  Savage opined to Hight that the committee was "going to pick mostly lefty books instead of looking for something really interesting." (*Id.* at 42)

    After several committee members made initial recommendations for books with liberal points of view, Savage wrote to Hight to propose the book *Freakonomics* by Stephen Dubner.  Hight forwarded this proposal to the entire committee on March 2, 2006, noting that she had received "a request that we . . . don't choose an ideologically or politically or religiously polarizing book."

    On March 3, 2006, Hamlin responded by email to the committee, stating: "If the idea is to seriously engage the students in an issue or issues of real importance, it is bound to be at least somewhat divisive."  He further stated: "Furthermore,

_____

    [2]Jones is openly gay.

2

I think the university can afford to polarize, and in fact has an obligation to, on certain issues." In this lengthy email, Hamlin also made references to Christian fundamentalism, which Savage inferred were directed at him.

> On March 8, 2006, Savage replied to the committee:

> I am wondering if when Hannibal says "the university can afford to polarize, and in fact has an obligation to, on certain issues," he means the book chosen should necessarily present views in line with University Human Resources policies or the University mission statement? As a librarian, I wouldn't agree with the imposition of any test of academic orthodoxy . . . . But if we are decided that we want to engage our students in the kind of exchange of ideas on which the "secular" university of founded, then let's choose something that confronts the accepted wisdom of Ohio State University! Like students and young profs did in the 60's, man!

> In that spirit, here are four more suggested titles . . .

The email then listed four books, each with a short description of its subject. One of the books was *The Marketing of Evil* by David Kupelian. The description of that book quoted by Savage did not reference the fact that it contains a chapter discussing homosexuality as aberrant human behavior that has gained general acceptance under the guise of political correctness.

Savage testified that he was not seriously suggesting that anyone read these books or that he was trying to make any point about homosexuality. He testified that he was, instead, trying to make a sarcastic point in response to Hamlin's remark about polarization.

On March 9, 2006, Jones wrote:

> [W]hatever book we choose should have some scholarly merit. **The anti-gay book Scott Savage endorses falsely claims that "the widely revered father of the "sexual revolution" has been irrefutably exposed as a full-fledged sexual psychopath who encouraged pedophilia."** . . . By any scholarly standards . . . this kind of claim is . . . anti-factual rabble-rousing that has no place in any university. **I am frankly embarrassed for you, Scott, that you would endorse this kind of homophobic tripe.**

(emphasis added).

On March 9, 2006, Savage responded to Jones, copying other committee members, defending his suggestion of *The Marketing of Evil* and stating it had been reviewed and endorsed by a person "with more scholarly heft than most anyone I know at MOSU."

Savage, Hamlin, and Jones exchanged more increasingly agitated emails, with Jones and Hamlin criticizing Savage for suggesting what they characterized as a bigoted and homophobic book. These exchanges degenerated to the point where Jones questioned Savage's competence and professionalism as a librarian, and Jones emailed Savage's supervisor, Library Director Beth Burns ("Burns"):

> I feel it is important as a faculty member here who relies on the library to tell you that Scott Savage's decision to stand by his recommendation of this anti-gay book for our First Year Reading Experience, especially based on the reasoning he offers, severely damages my confidence in the library and its staff here at OSU-Mansfield. It will affect not only my use of the library staff in conducting my own research, but also my use of the library staff in teaching and constructing research for my students.

Hamlin again weighed in, noting that homophobia implicated OSU's

4

policy on anti-discrimination.

On March 9, 2006, Burns emailed Dean Freeman complaining that Jones and Hamlin had engaged in a "personal assault" on Savage. In turn, Jones responded to Burns and Freeman about Savage's "questionable competence and [] his lack of professional regard for the faculty he has been hired to support." The same day, Savage wrote to Hight, withdrawing from the book selection committee.

Another gay professor, Jim Buckley, emailed all OSU-Mansfield faculty and staff, stating (to Savage): "You have made me fearful and uneasy being a gay man on this campus. I am, in fact, notifying the OSU-M campus, and Ohio State University in general, that I no longer feel safe doing my job. I am being harassed." This barrage of emails continued over the next few days.

At some point herein, Savage forwarded all these email messages to a conservative group called "Foundation for Individual Rights in Education" (FIRE).

On March 12, 2006, Jones sent an email to all faculty at the Mansfield campus summarizing the dispute over Savage's book recommendation and stating, in part:

> The fact that Scott continues to endorse a book that calls
> me and Jim and other gay and lesbian people "evil," and that
> he justifies this book on grounds that are ludicrous by
> scholarly standards, says to me this is about homophobia –
> that the hatred ("evil") and irrationality (anti-scholarly
> defense) this term implies are clearly operative here.  This

5

kind of defense would be unacceptable in support of a book
that denied the Holocaust or that argued that African-
Americans were inherently biologically inferior to other
people.  **This is a matter of professional standards and
competence, and it is also a matter of harassment — of
creating a hostile work environment insofar as part of our
jobs (mine and Jim's, but also the faculty's) is to use the
library for research and teaching.**  . . .

Some of my senior colleagues intend to raise this issue in
Monday's Faculty Assembly, and we are all interested in the
entire faculty's therefore being sufficiently informed about
the precise nature of the problem.

(emphasis added).

On March 13, 2006, Savage wrote to his contact at FIRE about

the continuing dispute, but stating: "The Dean here is very

deftly trying to stop any further attacks on me."[3]

That same day, a regularly-scheduled faculty assembly

meeting was held.  Various faculty members spoke and, at the

conclusion of the meeting, a motion carried to forward the matter

as a sexual harassment issue to Human Resources.  At another

faculty meeting two days later, however, the faculty rescinded

the motion to forward the matter to HR because they were

concerned it was not the correct procedure, but speakers noted

that individuals could file their own complaints with HR.

B.    **Complaints Under the OSU Harassment Policy**

On March 16, 2006, Professor Gary Kennedy filed a charge of

_____

[3]Savage had apparently met with Dean Freeman and Jones
around this time, prior to the faculty assembly meeting discussed
below.  Dean Freeman was attempting to foster a reconciliation
between the two on this matter.

discrimination/harassment on behalf of Buckley and Jones against Savage. The nature of the harassment alleged was "harassment based on sexual orientation." That day, Savage was brought into HR and given a copy of the complaint.

By letter dated March 20, 2006, Hamlin filed a separate "report" with HR regarding the dispute, stating: "I am filing this report about an incident which can, surely at the very least, be considered 'inappropriate behavior' and may even constitute 'discrimination' against these [gay] individuals."

Around this time, Savage contacted the Alliance Defense Fund ("ADF"), a conservative legal organization. On March 28, 2006, the ADF sent a letter titled "Cease and Desist" to OSU stating that it had been contacted by Savage regarding the harassment complaints made against him and that the University was violating Savage's constitutional right to free speech. The letter further demanded that OSU "immediately cease its unconstitutional investigation" of Savage and "issue a public statement that Scott Savage is not guilty of sexual harassment and that its investigation itself was inappropriate." Savage was advised by the ADF not to cooperate in the investigation.

The complaints of Kennedy and Hamlin were assigned to OSU Employee Relations Consultant Glenn Hill ("Hill") for an investigation. Hill interviewed five or six faculty members to investigate the complaints.

7

On April 11, 2006, Savage filed his own complaint of harassment charging Phelps, Jones, Buckley, Hamlin, and Kennedy with filing a false charge of sexual harassment against him. Savage demanded that the faculty members be "prosecuted" for their false charges. Savage's complaint was also assigned to Hill.

Meanwhile, the ADF publicized the matter on its website in support of Savage. Hamlin, Jones, and Kennedy reported that, as a result, they received violent and abusive emails and phone calls.

In early April, Savage also erected in the library a large display entitled "Academic Freedom at Your Library," with books and other materials on the topic.

On April 20, 2006, Savage received a letter from Hill stating that the University had determined that Savage was not guilty of the harassment charges filed against him. Approximately one week later, he received another letter from Hill stating that the five faculty members against whom Savage had filed his complaint had also been found not guilty of that charge.

The faculty members involved were not satisfied with the finding that Savage had not violated the harassment policy. Hamlin told Dean Freeman that he thought Savage should be fired but, after consultation with the Provost, Freeman told Hamlin

8

that Savage would not be fired.

Emails and letters continued on the subject through April and May 2006.  Defendants Hamlin and Phelps communicated to faculty that the harassment issue had not been resolved and questioned how faculty could work with Savage.  Savage characterizes these communications as a conspiracy on the part of the faculty involved to make it impossible for him to continue in his position at OSU-Mansfield.

**C.    Savage's Leaves of Absence and Resignation**

On July 5, 2006, Savage took a leave of absence from his job at OSU-Mansfield, which was later renewed to a second leave of absence.  He testified that, at the time he took the leaves, he intended to return to his job.

Savage filed the first of his lawsuits (discussed below) on April 7, 2007, which the defendants partially moved to dismiss. Savage states that the "nasty and derisive tone of the University's attorneys in both their written and oral arguments to the Court of Claims convinced Mr. Savage that he would have no institutional backing at the highest administrative level were he to return" to his position at OSU-Mansfield.

On June 27, 2007, Savage submitted a letter of resignation.

**D.    Litigation**

In 2007, Savage filed two civil suits arising out of this dispute: (1) an action against several OSU officials in the

9

Richland County, Ohio Court of Common Pleas; and (2) a suit in the Court of Claims of Ohio asserting federal and state law claims against OSU officials and OSU itself.

In his Court of Claims action, Savage sought a determination as to whether the named officials were entitled to personal immunity as provided by O.R.C. § 9.86, which states:

> [N]o officer or employee shall be liable in any civil action *that arises under the law of this state* for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in wanton or reckless manner.

O.R.C. § 9.86 (emphasis added).[4]  Savage pleaded alternatively that if the officials were found to be entitled to immunity, then he sought damages against OSU and the State of Ohio.

After some discovery and motion practice, Savage dismissed his action in the Court of Claims on July 29, 2008.

In the meantime, Savage filed this action on March 10, 2008, asserting various federal constitutional claims based on the same underlying events.  The action was effectively stayed while Savage pursued his state remedies.

On January 7, 2009, defendants filed a motion for summary judgment, central to which was the application of the Sixth Circuit's opinion in *Leaman v. Ohio Dep't of Mental Retardation &*

---

[4]O.R.C. § 2743.02(F) gives the Court of Claims of Ohio exclusive determination to determine whether O.R.C. § 9.96 immunity has been forfeited.

*Dev. Disabilities*, 825 F.2d 946 (6th Cir. 1987) (*en banc*).  As discussed at greater length below, *Leaman* holds that a plaintiff who files an action in the Court of Claims of Ohio is deemed to have waived *any* state or federal claim for damages[5] against state officials arising out of the same acts or omissions, as alleged in the Court of Claims, thereby providing those officials an affirmative defense in any subsequent action in federal court. *Id.* at 954.

On February 10, 2009, Savage moved this court to certify the *Leaman* issue to the Supreme Court of Ohio, which has never ruled on the waiver issue as it applies to federal claims.  This court held a hearing on that motion, after which it issued an order denying the motion to certify and denying the motion for summary judgment, without prejudice, with leave to renew after discovery. (Doc. #33)  The court set a discovery schedule as to plaintiff's claims for equitable relief and revised summary judgment deadlines.

Defendants thereafter renewed their motion for summary judgment, and the court heard oral argument on the motion on May 5, 2010.

---

[5]This waiver does not apply to claims for equitable relief.

11

### *Analysis*

**A.    *Leaman* Issue**

Defendants have renewed their motion for summary judgment on plaintiff's claims for damages as being barred under *Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities*, 825 F.2d 946 (6th Cir. 1987) (*en banc*).  The court concludes that this motion is well taken and that plaintiff's claims for damages are indeed barred.

In *Leaman*, the Sixth Circuit, *en banc*, interpreted O.R.C. § 2743.02(A)(1) , which states:

> Except in the case of a civil action filed by the state, filing a civil action in the court of claims results in a *complete waiver of any cause of action*, based on the same acts or omissions, which the filing party has against any state officer or employee.

(emphasis added).  The court held that "any cause of action" is unambiguous and includes both state and federal claims.  *Id.* at 951-52.   In *Thomson v. Harmony*, 65 F.3d 1314 (6th Cir. 1995), the Sixth Circuit reaffirmed this holding, despite intervening lower court cases in Ohio calling its reasoning into question.

The Ohio Supreme Court has never ruled on whether the waiver set forth in O.R.C. § 2743.02(A)(1) applies to federal claims.

While there is much debate about the soundness of the *Leaman* holding, it remains controlling Sixth Circuit precedent by which this court is bound.  *See Wrinn v. Johnson*, 315 Fed. App'x 560 (6th Cir.), *cert. denied*, 130 S. Ct. 625 (2009).

The court, therefore, finds that plaintiff waived his claims for damages against defendants in their individual capacities by filing the action in the Court of Claims of Ohio.[6]

**B.  Claims for Injunctive and Declaratory Relief**

Plaintiff also seeks non-monetary relief in the form of: (1) an order finding that he was constructively discharged in retaliation for the exercise of his First Amendment rights and an injunction requiring OSU to reinstate him to a position at another OSU campus; and (2) a declaration that the OSU harassment and discrimination policy at issue is unconstitutionally vague and overbroad.

The court concludes that neither of these claims can survive summary judgment.

**1.  First Amendment Retaliation**

The outcome of this claim depends largely on the correct interpretation of the decisions of the United States Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering v. Bd. of Ed. of Township High Sch. Dist.*, 391 U.S. 563 (1968).

Synthesizing the teaching of all three of these cases, an appropriate analysis must address the following issues:

1.  When Savage recommended *The Marketing of Evil* for the

---

[6]The court thus need not address defendants' alternative arguments regarding qualified immunity.

13

book list, was he speaking as a citizen (as opposed to purely as an employee) on a matter of public concern? *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568). If not, he has no cause of action based on the freedom of speech. *Id.* If his speech meets both criteria, Savage is protected from retaliation for it by his government employer (or here, the employer's alleged failure to protect him from the retaliation of others).

2. If Savage's speech is of public concern but made in the line of duty as set forth in *Garcetti*, should it nevertheless be protected under an "academic freedom" exception?

3. Since Savage resigned rather than being fired, was he constructively discharged?

### a. "Public Concern"

Issues involving curriculum, scheduling, and routine academic matters are not generally considered to be matters of public concern. *See, e.g., Lee v. York County Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007); *Kenney v. Genesee Valley Bd. of Coop. Educ. Serv.*, No. 07-CV-6442 CJS, 2008 WL 343110, at *4 (W.D.N.Y. Feb. 6, 2008). *Cf. Landrum v. Eastern Ky. Univ.*, 578 F. Supp. 241 (E.D. Ky. 1984).

Defendants argue that the mere suggestion of a book for a book list to fellow committee members is not a matter of public concern even though some parts of the book may be of public concern. Savage, somewhat contradictory to his interests on this

14

issue, states that he did not actually intend that the book should make the required-reading list, but merely intended to point out what he deemed to be the hypocrisy of the other members' statements that the list should contain controversial works.

Nevertheless, the chapter of the book concerning homosexual rights certainly raises issues of public concern and, since the controversy expanded beyond the committee and became public as described above, the court holds that Savage's suggestion to require the book meets the public-concern prerequisite.

### b. "As a Citizen"

This is a more difficult issue and requires the court to assess the application of the decision of the Supreme Court in *Garcetti* to this situation.

In *Garcetti,* the Court developed the doctrine originally announced in *Pickering and Connick, supra.* Those cases had held that one who spoke on a matter of public concern was protected by the freedom of speech clause of the First Amendment from retaliation by government, usually the plaintiff's employer. The speech right had to be balanced against the employer's need to preserve the efficiency of the workplace. *See Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 150-51. *See also Farhat v. Jopke*, 370 F.3d 580, 593-95 (6th Cir. 2004) (discussing *Pickering* balancing test).

15

*Garcetti* added the corollary that the speech, although it might be of public concern, is not protected by the First Amendment if it is made pursuant to the public employee's job duties. *Garcetti*, 547 U.S. at 421. Thus, in *Garcetti*, a county prosecutor's speech was not protected when he recommended dropping a prosecution because in his view the affidavit used by the police to obtain a search warrant contained serious inaccuracies. *Id.* at 421-22.

The Court discussed at length the necessity of balancing the government's rights as employer against the employee's rights as a citizen. *Id.* at 418-20. The Court resolved this balancing process as follows:

> The controlling factor in [plaintiff's] case is that his expressions were made pursuant to his duties as a calendar deputy. . . . That consideration – the fact that [plaintiff] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case – distinguishes [plaintiff's] case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Id.* at 421.

The Sixth Circuit has applied *Garcetti* to preclude First Amendment claims by public employees alleging retaliation for speech made in the course of their official duties. *See, e.g., Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543-44 (6th Cir. 2007) (holding that park ranger was not speaking as a citizen

16

when she answered questions from consultant who was paid by management to evaluate morale problems in the department); *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364-65 (6th Cir. 2007) (holding that police officer's speech in opposition to reductions in the city's canine-training program was made pursuant to his duties as a canine handler and patrolman and he thus could not maintain a First Amendment claim).

Here, Savage made his recommendation for the reading list "pursuant to [his] official duties." It makes no difference that he was not strictly required to serve on the committee. *See Gorum v. Sessoms*, 561 F.3d 179, 185-86 (3d Cir. 2009) (*Garcetti* precludes First Amendment claim by professor who "opted" to assist student during disciplinary proceeding; it was through his position and department chair that he was able to advise student); *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008) (rejecting professor's argument that claim based on speech criticizing university's use of grant funds was not controlled by *Garcetti* because tasks in relation to grant were not a requirement of his job but were discretionary); *Weisbarth*, 499 F.3d at 544 (*Garcetti* applies to ad hoc duties even though they may not be within employee's official responsibilities).

Even if it was not Savage's intent that *The Marketing of Evil* actually be included on the final list, his intent was to further the dialogue among the committee members by pointing out

17

that, in his view, they were not consistent in applying the criteria they had espoused, namely, that controversial works be included on the reading list.

Therefore, Savage's expression, although it addressed a matter of public concern, was not protected under the First Amendment under the rule of *Garcetti,* unless some exception to that rule is applicable.

### c.  Academic Freedom

Responding to concerns expressed by Justice Souter that the *Garcetti* rule "may have important ramifications for academic freedom, at least as a constitutional value," *Garcetti*, 547 U.S. at 425, the Court observed:

> There is some argument that expression related to academic *scholarship or classroom instruction* implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence.  We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to *scholarship or teaching*.

*Id.* (emphasis added).

Thus, the Court reserved its resolution of this important issue for another day.  Some circuits have recognized an "academic freedom" exception to the *Garcetti* doctrine and some have not.  *See generally* Robert J. Tepper & Craig G. White, *Speak No Evil: Academic Freedom and the Application of Garcetti v. Ceballos to Public University Faculty*, 59 Cath. U. L. Rev. 125

18

(2009).  The Sixth Circuit has not weighed in on this issue.

Two decisions of the United States District Court for the Southern District of Ohio have held that such an academic freedom exception exists, however.  *See Kerr v. Hurd*, – F. Supp.2d –, No. 3:07-cv-297, 2010 WL 890638, at *19-*20 (S.D. Ohio Mar. 15, 2010) (Merz, M.J., exercising consensual jurisdiction under 28 USC § 636(c)) (holding that *Garcetti* does not apply to First Amendment claim by professor for state medical school); *Evans-Marshall v. Bd. Of Educ. of Tipp City Exempted Village Sch. Dist.*, No. 3:03cv091, 2008 WL 2987174, at *8 (S.D. Ohio July 30, 2008) (Rice, J.) (holding that *Garcetti* does not apply to First Amendment claim by high school teacher).

In both of these cases, however, it was clear that the plaintiff's expression concerned "scholarship or teaching."  The *Garcetti* Court recognized no broader exception to the rule it propounded.  Savage's recommendation of a book for a book list cannot, in the opinion of this court, be classified as "scholarship or teaching," however.  The recommendation was made in the line of duty, but it was made pursuant to an assignment to a faculty committee.  This court holds that, without exceptional circumstances, such activities cannot be classified as "scholarship or teaching" in the *Garcetti* sense.  *Cf. Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, – F.3d –, No. 09-1688, 2010 WL 1948203, at *3-*4 (6th Cir. May 17, 2010) (holding that

19

elementary school teacher's complaints about the size of her workload fell within *Garcetti*).[7]

Therefore, the court holds that Savage's expression was subject to the general *Garcetti* rule and is unprotected, regardless of the existence of an "academic freedom" exception.[8]

### d.    Constructive Discharge

Because Savage's speech here is not protected by the First Amendment, the court need not reach the question of whether he could satisfy the element of "constructive discharge."  Suffice to say, however, that this standard is a stringent one, and the record raises no triable issue on this element.

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit."  *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  To determine if there is a constructive discharge, "both the employer's intent and the employee's objective feelings must be examined."  *Id.* (citation omitted).  "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the

_____

[7]As in *Fox,* the results of the committee's work here were for the benefit of the university supervisors and not for an outside agency or the general public.

[8]Because the court finds *Garcetti* to be dispositive, it need not conduct a *Pickering* analysis.

20

employer's actions." *Id.*

Savage cannot show that OSU made his working conditions so intolerable that a reasonable person in his position would have felt compelled to resign. Although the controversy that erupted over his book recommendation resulted in faculty members publicly criticizing his judgment and professionalism, these members had no power over Savage's job and no ability to discipline or fire him. Savage testified that Beth Burns, his immediate supervisor, expressed strong support for his position. (Savage Depo. A at 75)[9] And OSU-Mansfield Dean Freeman, who <u>did</u> have the hire-and-fire power over Savage (Savage Depo. B2 at 111), never suggested to Savage that he would be fired and instead expressed support for him. There is thus no objective evidence that Savage's <u>employer</u> took any action intended to force him out of his job.

In *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002), the Sixth Circuit affirmed a grant of summary judgment to the plaintiff's former employer on a claim for constructive discharge. The plaintiff, a long-time employee, was demoted after a change in management and alleged that he had been subjected to a variety of derogatory remarks about his age. Rather than remain in his new position, the plaintiff opted for early retirement. *Id.* at 464.

---

[9]Savage testified that his relationship with Burns actually improved as a result of these events. (Savage Depo. A at 91)

21

The plaintiff then sued for age discrimination, along with other claims, and alleged that his retirement was actually a constructive discharge.  The Sixth Circuit rejected this claim, stating:

> Here, Peters concedes that the only problem he had with he transfer was that Jay Elliott would still be his superior if he took the new Director's job.  However, . . . there is no objective evidence to support Peters' claim.  Peters did not testify that he felt he would be terminated if he took the new position.  He acknowledged that the position he was offered was "professional" and "meaningful."
>
> **Peters' only real complaint was that he could not work with someone who had demoted him.  However, as the District Court noted, hurt feelings are not enough to create a case of constructive discharge.  While Peters testified that he had some general "suspicions" about a systematic plot to eliminate older employees, his feelings are based upon nothing more than suspicion and conjecture.**

*Id.* at 479 (emphasis added).

Thus, the fact that Savage felt wounded by the criticism of several faculty members and unnerved by their challenge to his professionalism does not create an objectively "intolerable" working environment, given that he had the strong support of his immediate supervisor and no indication from the Dean that his job was in jeopardy.

Further, as defendants point out, Savage testified that, at the time he began his leave of absence, he intended to return to his position.  (Savage Depo. A at 111)  The logical inference from this testimony is that no basis for a constructive discharge existed at that time, because Savage felt he could and would

22

return.  What turned the tide, Savage testified, was the conduct of OSU's attorneys in the ensuing litigation in the Ohio Court of Claims.  (Savage Aff. ¶ 31; Savage Depo. A at 113-15)  It was the "nasty and derisive tone" of the attorneys that Savage says "convinced [him] that [he] would have no institutional backing . . . were I to return to my library position at OSU-Mansfield." *Id.*

Savage provides no authority that such circumstances could constitute a constructive discharge.  That the OSU attorneys "played hardball" in court after Savage sued the University sheds no light on whether his working environment – as opposed to the litigation forum – had been rendered objectively intolerable.

While Savage may have been offended by the litigation tactics of OSU's attorneys, they provide no basis on which to rest a constructive discharge claim.

The court, therefore, concludes that there is no triable issue as to whether Savage was constructively discharged.

### 2.  Harassment and Discrimination Policy

#### a.  Facial Challenge

"The overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to 'chill' the exercise of free speech and expression." *Dambrot v. Central*

*Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (citations omitted).

However, for standing purposes, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). *See also Morrison v. Bd. of Educ. of Boyd County*, 521 F.3d 602, 610 (6th Cir. 2008) ("In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm – i.e., enforcement of a challenged statute – occurred or is imminent."), *cert. denied*, 129 S. Ct. 1318 (2009).

In *Booher v. Board of Regents*, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. 1998), on which Savage relies, the court held that a professor, who had been investigated pursuant to a complaint filed against him under Northern Kentucky University's sexual harassment policy, had standing to challenge the policy as unconstitutionally overbroad, even though he ultimately was not disciplined under the policy. The court's reasoning, however, indicates that the threat of future harm to the plaintiff through enforcement of the challenged policy was necessary to its conclusion:

> In First Amendment cases, a plaintiff need not be prosecuted before bringing suit to challenge an alleged unconstitutional law. . . . In the instant case, although the provost eventually found that the record did not support the panel's disciplinary action, the plaintiff was charged and was subjected to the disciplinary process. **Furthermore,**

24

> **there is no indication that the plaintiff has stopped, or
> intends to stop, the types of classroom behaviors that led
> to the student's complaint of harassment.  Therefore, the
> court finds that a live controversy exists regarding the
> effects of the sexual harassment policy and that there is a
> 'realistic and credible threat' that the policy will be
> enforced against the plaintiff in the future."**

*Id.* at *19-*20 (citations omitted).

Here, Savage's only remaining challenge to the policy is a
prospective one for declaratory and injunctive relief, because
his claims for damages are barred by *Leaman*.  However, Savage is
no longer employed by OSU and, given the above ruling, is not
entitled to reinstatement.  He thus cannot show even a remote
possibility of being subject to the policy in question in the
future.  As a matter of law, therefore, he lacks standing to
pursue this claim.  *See, e.g., Piggee v. Carl Sandburg College*,
464 F.3d 667, 673 (7th Cir. 2006) (holding that instructor lacked
standing to seek injunction against college's restriction on her
speech because she was no longer employed and thus could not show
"real and immediate" danger of sustaining direct injury from
allegedly unlawful restriction).

### b.  "As Applied" Challenge

Briefly, Savage's claim that the policy is invalid as
applied to him also fails because he ultimately was not
disciplined under it.  As the *Booher* court stated:

> As to the claim that the policy is unconstitutional as
> applied to plaintiff, the court must determine whether
> application of the policy actually harmed the plaintiff.

The plaintiff appealed the panel's decision to the provost, Gaston, who found that the record did not support the panel's determination and who then granted the appeal. Therefore, no disciplinary action was taken against the plaintiff. **The plaintiff alleges several harms: the stigma that attaches to one charged with sexual harassment; the fact that he had to endure the disciplinary process and appeal; the associated mental anguish; and the financial burden of presenting his defense.  The court finds that these types of harm do not support a claim under the First Amendment.  Because the plaintiff has suffered no employment-related injury such as disciplinary sanction, the plaintiff's claim regarding the application of the policy to him fails.**

*Booher*, 1998 U.S. Dist. LEXIS at *33-*34 (emphasis added).

Therefore, having reviewed this matter closely, and being otherwise sufficiently advised,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. #46) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 7th day of June, 2010.



Signed By:

**_William O. Bertelsman_** WOB

**United States District Judge**